Uploaded: 2022JUN23 16:44 Filed By:JBLAYLOCK on behalf of Bar# 37513 HMCCORMICK Reference: EF-104902
E-Filed: 2022JUN23 NEWPORT NEWS CC BLJOHNSON at 2022JUN27 08:53 CL2202355T-00

VIRGINIA:  IN THE CIRCUIT COURT FOR THE CITY OF NEWPORT NEWS

**JAMES EDWARD ELLIOTT**

               Plaintiff,

v.                                     CIVIL ACTION NO.:

**JOHN CRANE, INC.**
227 West Monroe St., Ste. 1800
Chicago, IL  60606
SERVE:      CT CORPORATION SYSTEM
                  REGISTERED AGENT
                  4701 Cox Road, Suite 285
                  Glen Allen, VA  23060

**A. W. CHESTERTON, INC.**
860 Salem Street
Groveland, MA 01834
SERVE:      Secretary of the Commonwealth
                  Patrick Henry Building, 4th Floor
                  1111 East Broad Street
                  Richmond, VA  23219

**ALBANY INTERNATIONAL CORP.**
**f/k/a ALBANY FELT COMPANY**
216 Airport Drive
Rochester, NH 03867-1718
SERVE:      UNITED AGENT GROUP INC.
                  REGISTERED AGENT
                  425 W. Washington St., Ste. 4
                  Suffolk, VA 23434-5320

**CBS CORPORATION, f/k/a Viacom, Inc.,**
**Successor by Merger to CBS Corporation and**
**f/k/a Westinghouse Electric Corporation**
51 West 52 Street
New York, NY  10019-6188
SERVE:      CORPORATION SERVICE COMPANY
                  REGISTERED AGENT
                  100 Shockoe Slip, 2nd Floor
                  Richmond, VA 23219

1

<u>EXHIBIT A</u>

**FERGUSON ENTERPRISES, LLC**
**as successor by merger to John H. Frischkorn, Jr., Inc.**
12500 Jefferson Avenue
Newport News, VA 23602
SERVE:      CORPORATE CREATIONS NETWORK INC.
            REGISTERED AGENT
            425 W. Washington St., Ste. 4
            Suffolk, VA 23434-5320

**GENERAL ELECTRIC COMPANY**
5 Necco Street
Boston, MA 02210-1403
SERVE:      CT CORPORATION SYSTEM
            REGISTERED AGENT
            4701 Cox Road, Suite 285
            Glen Allen, VA 23060

**GOULDS PUMPS LLC**
240 Fall Street
Seneca Falls, NY 13148
SERVE:      CT CORPORATION SYSTEM
            REGISTERED AGENT
            4701 Cox Rd., Suite 285
            Glen Allen, VA 23060

**J. HENRY HOLLAND CORPORATION**
5931 Thurston Avenue
Virginia Beach, VA 23455
SERVE:      MICHELLE FANNEY DALLMAN
            REGISTERED AGENT
            440 Monticello Court, Suite 2200
            Norfolk, VA 23510

**METROPOLITAN LIFE INSURANCE COMPANY**
1095 Avenue of the Americas
New York, NY 10036-6796
SERVE:      CT CORPORATION SYSTEM
            REGISTERED AGENT
            4701 Cox Road, Suite 285
            Glen Allen, VA 23060

2

EXHIBIT A

**REDCO CORPORATION f/k/a CRANE CO.**
100 Stamford Place
Stamford, CT  06902
SERVE:       Secretary of the Commonwealth
                 Patrick Henry Building, 4th Floor
                 1111 East Broad Street
                 Richmond, VA  23219

**SCAPA NORTH AMERICA INC.**
111 Great Pond Dr
Windsor, CT 06095
SERVE:       Secretary of the Commonwealth
                 Patrick Henry Building, 4th Floor
                 1111 East Broad Street
                 Richmond, VA  23219

**UNION CARBIDE CORPORATION**
1254 Enclave Parkway
Houston, TX  77077
SERVE:       CT CORPORATION SYSTEM
                 REGISTERED AGENT
                 4701 Cox Road, Suite 285
                 Glen Allen, VA 23060

**WACO, INC.**
5450 Lewis Road
Sandston, VA  23150
SERVE:       DANIEL M. WALKER
                 REGISTERED AGENT
                 5450 Lewis Road
                 Sandston, VA  23150

**WARREN PUMPS LLC**
82 Bridges Ave.
Warren, MA 01083-0969
SERVE:       Secretary of the Commonwealth
                 Patrick Henry Building, 4th Floor
                 1111 East Broad Street
                 Richmond, VA  23219

                 Defendants.

EXHIBIT A

## **COMPLAINT**

NOW COMES JAMES EDWARD ELLIOTT, a resident of the Commonwealth of Virginia, and alleges as follows:

1.      This action arises from certain injuries incurred by JAMES EDWARD ELLIOTT as a direct and proximate result of his exposure to asbestos-containing products that were designed, produced, manufactured, distributed, sold, utilized, installed, disturbed, or maintained by each named Defendant or their predecessors in interest as named in this action.

2.      This action is subject to the Standing Orders entered in the Circuit Court for the City of Newport News in regards to asbestos cases filed by the firm of Patten, Wornom, Hatten & Diamonstein, L.C.

3.      As used hereafter, the term "asbestos-containing product" will be used to identify collectively: (i) raw asbestos fiber, (ii) end products directly incorporating asbestos fiber, and (iii) end products manufactured, assembled, or supplied by a defendant who has specified and/or required raw asbestos and/or products incorporating asbestos manufactured or supplied by others, to be used, whether internally or externally, in conjunction with the end product for the routine maintenance, repair, or proper and intended use and operation of the end product.

4.      As used hereafter, the term "asbestos-containing packing" shall include asbestos-containing sheet packing, gaskets, braided packing, extruded packing, and all other such products designed for use in sealing pipe flanges, valves, pumps, turbines, generators, bulkheads, and for other such applications.

5.      Plaintiff JAMES EDWARD ELLIOTT was born in 1944.

6.      Plaintiff JAMES EDWARD ELLIOTT was employed at West Point Paper Mill, West Point, Virginia, located in the County of King William, Virginia, from August 10, 1964 to

EXHIBIT A

August 31, 2004 in various capacities, including, but not limited to, machinist, millwright, planner, general foreman, and supervisor. It is believed that JAMES EDWARD ELLIOTT was exposed to asbestos-containing dust, fibers, or particles, arising from the intended, ordinary, or foreseeable use of the each of the defendants' products, on a routine and frequent, almost daily basis, from the time that he began his employment at the West Point Paper Mill until sometime in the mid to late 1970s.

7.      As a direct and proximate result of his exposure to asbestos-containing dust, fibers, or particles, arising from the intended, ordinary, or foreseeable use of each of the defendants' products, JAMES EDWARD ELLIOTT was diagnosed with malignant mesothelioma of the pleura on April 5, 2022.  Malignant mesothelioma of the pleura is a rapidly debilitating and fatal form of cancer affecting the lining of an individual's lungs, the only known cause of which is asbestos exposure.

8.      All Defendants knew or had reason to know from at least 1936 onwards that breathing asbestos fibers could and would kill human beings.

9.      All defendants knew or had reason to know from at least 1952 onwards that breathing asbestos fibers could cause lung cancer and that there was no way to set a "safe" threshold of exposure to asbestos.

10.     All defendants knew or had reason to know from at least 1960 onwards that breathing asbestos fibers would cause the cancer mesothelioma and that there is no safe level of exposure to asbestos for the disease mesothelioma.

11.     The occupational asbestos exposures that JAMES EDWARD ELLIOTT experienced at the West Point Paper Mill from the intended, ordinary, or foreseeable use of each of the defendants' asbestos-containing products were heavy exposures, substantially above any

EXHIBIT A

reported background levels of asbestos, and were sufficient, in and of themselves, to cause JAMES EDWARD ELLIOTT's malignant pleural mesothelioma.

12.    The defendants are corporations, companies, or other business entities which, during all times material hereto, and for a long time prior thereto, have been, or are now engaged, directly or indirectly, in the manufacturing, producing, selling, merchandising, supplying, distributing, incorporating, or otherwise placing in the stream of commerce, asbestos products or asbestos-containing equipment. Courts of the Commonwealth of Virginia have personal jurisdiction over all Defendants.

13.    The named defendants in this action include both domestic and foreign corporations which have registered to do business in the Commonwealth of Virginia, or alternatively, are entities that have affirmatively placed asbestos-containing products into the stream of commerce with the reasonable expectation and knowledge that such asbestos-containing products would be bought, sold, distributed, or put to use within the Commonwealth of Virginia, as well as other states, within the United States of America.

14.    At all times material hereto, Defendants acted through their agents, servants, or employees who were acting within the scope of their employment on the business of the defendants.

15.    At all times material hereto:

(a).    Defendant, JOHN CRANE, INC., a Delaware corporation, manufactured, produced, distributed, sold, or supplied, either directly or indirectly, to Plaintiff, to Plaintiff's employer, or to others for use on the jobsite where Plaintiff performed his job duties, asbestos-containing products (chrysotile, crocidolite, and tremolite) including, without limitation, asbestos-containing packing materials and asbestos-containing gasket materials, as defined above.

6

EXHIBIT A

(b).    Defendant, A. W. CHESTERTON, INC., a Delaware corporation, manufactured, produced, distributed, sold, or supplied, either directly or indirectly, to the Plaintiff, to the Plaintiff's employer, or to others for use on the jobsite where Plaintiff performed his job duties, asbestos-containing products (chrysotile, crocidolite, and tremolite) including, without limitation, sheet packing, asbestos-containing valve packing, or asbestos-containing gasket material.

(c).    Defendant, ALBANY INTERNATIONAL CORP., formerly known as ALBANY FELT COMPANY, a Delaware corporation, manufactured, produced, distributed, sold, or supplied, either directly or indirectly, to Plaintiff, to Plaintiff's employer, or to others for use on the jobsite where Plaintiff performed his job duties, asbestos-containing dryer felt.

(d).    Defendant, CBS CORPORATION, a Delaware corporation, f/k/a VIACOM, INC., successor by merger to CBS Corporation, a Pennsylvania corporation, f/k/a WESTINGHOUSE ELECTRIC CORPORATION, a Pennsylvania corporation, manufactured, produced, sold, distributed, or supplied, either directly or indirectly, to Plaintiff, to Plaintiff's employer, or to others for use on the jobsite where Plaintiff performed his job duties, land based non-military turbines for use at nonmilitary land based  sites and asbestos containing micarta for use as spacers in motors.

(e).    Defendant, FERGUSON ENTERPRISES, LLC, a Virginia corporation, individually and as successor to John H. Frischkorn, Jr., Inc., sold, distributed, or supplied, either directly or indirectly, to Plaintiff, to Plaintiff's employer, or to others for use on the jobsite where Plaintiff performed his job duties, various asbestos-containing products including, without limitation, asbestos-containing sheet packing, gaskets, asbestos containing braided pump and valve packing, extruded packing, and many other such products designed for use in sealing pipe

7

flanges, valves, pumps, turbines, generators, bulkheads, and for other such applications.

(f).    Defendant, GENERAL ELECTRIC COMPANY, a New York corporation, manufactured, produced, distributed, sold, or supplied, either directly or indirectly, to Plaintiff, to Plaintiff's employer, or to others for use on the jobsite where Plaintiff performed his job duties, without limitation, land based non-military turbines for use at non-military land based sites. Defendant also manufactured, produced, distributed, sold, or supplied, either directly or indirectly, to Plaintiff's employer, or to others for use on the jobsite where Plaintiff performed his job duties, without limitations, asbestos containing pumps, generators, split-phase motors, transducers, heating coils, electrical components such as contactors, arc switches, arc chutes, switchgears, wire, cable, cords, circuit breakers, and other asbestos containing products.

(g).    Defendant, GOULDS PUMPS LLC, a Delaware corporation, manufactured, produced, distributed, sold, or supplied, either directly or indirectly, to Plaintiff, to Plaintiff's employer, or to others for use on the jobsite where Plaintiff performed his job duties, asbestos-containing products (chrysotile, crocidolite, and tremolite) including, without limitation, asbestos containing pumps, condensate pumps, distillate pumps, distilling plant distillate pumps, acid circulating pumps, caustic material circulating pumps, and pump repair or replacement material including, without limitation, asbestos-containing packing material and asbestos-containing gasket material, as defined above.

(h).    Defendant, J. HENRY HOLLAND CORPORATION, a Virginia corporation, sold, distributed, or supplied, either directly or indirectly, to Plaintiff, to Plaintiff's employer, or to others for use on the jobsite where Plaintiff performed his job duties, asbestos-containing products or insulation materials including, without limitation, asbestos-containing packing materials and asbestos-containing gasket materials, as defined above.

8

EXHIBIT A

(i).    Defendant, METROPOLITAN LIFE INSURANCE COMPANY, a New York corporation authorized to do business in the Commonwealth of Virginia, has its principal place of business at 1 Madison Avenue, New York, New York 10010.  This defendant did not manufacture, sell, or distribute asbestos-containing products, but this defendant acted in conspiracy with other defendants, as set forth below in Count III.

(j).    Defendant, REDCO CORPORATION, f/k/a CRANE CO., a Delaware corporation, Individually and as successor to CHAPMAN VALVE MANUFACTURING CO., manufactured, produced, distributed, sold, or supplied, either directly or indirectly, to Plaintiff, to Plaintiff's employer, or to others for use on the jobsite where Plaintiff performed his job duties, asbestos-containing products including, without limitation, pumps, valves, insulating products, pump and valve repair or asbestos-containing replacement material including asbestos-containing packing, as defined above.

(k).    Defendant, SCAPA NORTH AMERICA INC., a Delaware corporation, manufactured, produced, sold, distributed, or supplied, either directly or indirectly, to Plaintiff, to Plaintiff's employer, or to others for use on the jobsite where Plaintiff performed his job duties, asbestos-containing dryer fabrics.

(l).    Defendant, UNION CARBIDE CORPORATION, a New York corporation, manufactured, produced, distributed, sold, or supplied, either directly or indirectly, to Plaintiff, to Plaintiff's employer, or to others for use on the jobsite where Plaintiff performed his job duties, asbestos-containing products including, without limitation, electrical products, plasters, and asbestos resins such as General Purpose Bakelite, Heat Resistant Bakelite, High Impact Heat Resistant Bakelite, or Bakelite Molding Compound.  This Defendant also sold or distributed bulk quantities of raw asbestos fibers mined from the Calidria Mines to many of the defendants listed

EXHIBIT A

herein for incorporation into their asbestos-containing products under various trade names.

(m). Defendant, WACO, INC., a corporation incorporated under the rules of Virginia having its corporate offices at 814 Chapman Way, Newport News, Virginia, and a successor to WACO INSULATION, INC, sold, distributed, supplied, either directly or indirectly, to Plaintiff, to Plaintiff's employer, or to others for use on the jobsite where Plaintiff performed his job duties, various asbestos-containing products including, without limitation, construction and/or repair products like pipecovering sections, block, cement, and textiles manufactured by different companies.

(n). Defendant, WARREN PUMPS, LLC, a Massachusetts corporation, manufactured, produced, distributed, sold, or supplied, either directly or indirectly, to Plaintiff, to Plaintiff's employer, or to others for use on the jobsite where Plaintiff performed his job duties, asbestos-containing products including, without limitation, pumps and pump repair or asbestos-containing replacement material including asbestos-containing packing, as defined above.

### COUNT I - NEGLIGENCE

16.     Plaintiff hereby incorporates by reference Paragraphs One (1) through Fifteen (15) inclusive, as if the same were hereto set forth at length.

17.     At all times material hereto, Plaintiff JAMES EDWARD ELLIOTT was not aware of the nature and extent of the danger to his general health, and more specifically to his respiratory system, heart, and other bodily parts that would result from his contact with, exposure to, or inhalation of the asbestos dust, fibers, or particles resulting from the intended, ordinary, and foreseeable use of the defendants' asbestos-containing products; whereas, each of the Defendants knew, had reason to know, should have known, or could have reasonably determined that Plaintiff JAMES EDWARD ELLIOTT would inhale asbestos dust, fibers, or particles during or as a

EXHIBIT A

consequence of the intended, ordinary, or foreseeable use of their asbestos-containing products and, despite such facts, Defendants, individually, jointly, and severally were negligent in one or more of the following respects. Defendants:

(a).     Manufactured, sold, distributed, incorporated, or otherwise placed in the stream of commerce asbestos-containing products, which Defendants knew or in the exercise of ordinary care should have known, or had reason to know, were imminently and inherently dangerous, or otherwise highly harmful and defective without a proper warning calculated to reach JAMES EDWARD ELLIOTT and others exposed to asbestos dust, fibers, or particles resulting from the intended, ordinary, or foreseeable use of their asbestos-containing products;

(b).     Failed to take reasonable precautions or to exercise reasonable care to adequately or sufficiently warn JAMES EDWARD ELLIOTT of the dangers and harm to which he was exposed as a consequence of the inhalation of asbestos dust, fibers, or particles resulting from the intended, ordinary, or foreseeable use of their asbestos-containing products;

(c).     Failed and omitted to provide JAMES EDWARD ELLIOTT with the knowledge of reasonably safe and sufficient safeguards, wearing apparel, proper safety equipment, or appliances needed to protect him from being injured, disabled, killed, or otherwise harmed by working with, using, handling, coming into contact with, or inhaling the asbestos dust, fibers, or particles resulting from the intended, ordinary, or foreseeable use of their asbestos-containing products;

(d).     Failed to place any warnings or adequate and sufficient warnings on their asbestos-containing products or inside the containers of their asbestos-containing products and to suitably apprise JAMES EDWARD ELLIOTT of the risks and dangers inherent in the intended, ordinary, or foreseeable use of their asbestos-containing products and the precautions necessary to

11

EXHIBIT A

Case 4:22-cv-00072-AWA   Document 1-2   Filed 06/28/22   Page 12 of 30 PageID# 21

make their asbestos-containing products safe for their intended, ordinary, or foreseeable uses;

(e).    Failed to place any warnings or adequate and sufficient warnings on or inside the packaging of their asbestos-containing products, or otherwise, to inform JAMES EDWARD ELLIOTT, or any foreseeable user, of the dangers inherent in the repair and replacement of such asbestos-containing products, which repair or replacement foreseeably required the removal of friable and inherently dangerous asbestos-containing products and materials;

(f).    Failed to place warnings, or adequate and sufficient warnings on or inside the containers of their asbestos-containing products, or in technical manuals, drawings or specifications supplied with their asbestos-containing products to inform JAMES EDWARD ELLIOTT of the enhanced risk and dangers inherent in the intended, ordinary, or foreseeable use of their asbestos-containing products in the environment of industrial or commercial activities where the Defendants knew, should have known, or had reason to know that many other asbestos-containing products were also being dangerously and simultaneously used without controls of safety procedures;

(g).    Failed to adequately test their asbestos-containing products to determine the nature and extent of the risk from the foreseeable use, maintenance, repair, or removal of their products and the need for warnings and recommended safety instructions to eliminate or reduce that risk;

(h).    Failed to advise JAMES EDWARD ELLIOTT, who the defendants knew, should have  known, or had reason to know, was exposed to asbestos dust, fibers, or particles resulting from the intended, ordinary, or foreseeable use of their asbestos-containing products, to cease all future exposure to asbestos dust, fibers, or particles; to be examined by a lung specialist

<u>EXHIBIT A</u>

to determine the nature and extent of any and all asbestos diseases caused by such exposure; and to receive treatment for such diseases.

18.     Such negligent and deliberate acts of the defendants proximately resulted in the plaintiff's long-term inhalation of asbestos dust, fibers, or particles from the intended, ordinary, or foreseeable use of the defendants' asbestos-containing products, including the routine, recommended, or expected maintenance of the defendants' asbestos-containing products, and this exposure directly and proximately caused JAMES EDWARD ELLIOTT to contract malignant pleural mesothelioma, which is permanent and fatal.

19.     The defendants' foregoing acts, failures, and omissions were willful or wanton in nature, were undertaken with actual or constructive knowledge that injury would result, or were accomplished with such recklessness as to evince a conscious disregard for the health, safety, and rights of JAMES EDWARD ELLIOTT.

## COUNT II - BREACH OF IMPLIED WARRANTY

20.     The Plaintiff hereby incorporates by reference Paragraphs One (1) through Nineteen (19) inclusive, as if the same were hereto set forth at length.

21.     Defendants impliedly warranted that their asbestos-containing products were reasonably fit for use and safe for their intended purposes.

22.     At the time of the manufacture, incorporation, or sale of their asbestos-containing products to Plaintiff, to Plaintiff's employer, or to others for use on the jobsite where Plaintiff performed his job duties, the Defendants knew, should have known, or had reason to know, that JAMES EDWARD ELLIOTT was a person who the Defendants might reasonably have expected to use, consume, or by affected by their asbestos-containing products.

23.     Throughout the years that JAMES EDWARD ELLIOTT was exposed to

EXHIBIT A

Defendants' asbestos-containing products, the defendants expected that their asbestos-containing products would reach, and they in fact did reach, the ultimate user or consumer without substantial change in the condition in which they were sold.

24.     The defendants' asbestos-containing products were sold in a defective condition in that they were incapable of being made safe for their intended, ordinary, or foreseeable use, and said Defendants failed to give adequate or sufficient warnings or instructions about the unreasonable risks and dangers inherent in their asbestos-containing products.

25.     Defendants breached said warranties to JAMES EDWARD ELLIOTT in that their asbestos-containing products were imminently and inherently dangerous, defective, hazardous, unfit for use, not properly merchantable, and not safe for their intended, ordinary, or foreseeable uses and purposes and such breaches proximately resulted in JAMES EDWARD ELLIOTT contracting malignant pleural mesothelioma, which is permanent and fatal.

26.     The defendants' foregoing acts, failures, or omissions were willful or wanton in nature; were undertaken with actual or constructive knowledge that injury would result; or were accomplished with such recklessness as to evince a conscious disregard for the health, safety, and rights of JAMES EDWARD ELLIOTT.

<b><u>COUNT III – CONSPIRACY</u></b>

27.     The Plaintiff hereby incorporates by reference Paragraphs One (1) through Twenty-Six (26), inclusive, as if the same were hereto set forth at length.

28.     Defendants and Metropolitan Life Insurance Company, individually, jointly, in conspiracy with each other, and as an industrial and trade association or group for many decades have been possessed of medical and scientific data which clearly indicated that the inhalation of asbestos dust and fibers resulting from the intended, ordinary, or foreseeable use of their asbestos-

14

<u>EXHIBIT A</u>

containing products were imminently, inherently, and unreasonably dangerous, carcinogenic, and potentially deadly.

29.     Despite the medical and scientific data possessed by and available to them, the defendants, prompted by pecuniary motives, individually, jointly, and in conspiracy with each other, fraudulently, willfully, deliberately, maliciously, and callously:

(a).     Ignored, withheld, or actively concealed said medical and scientific data from the public, and particularly persons like Plaintiff JAMES EDWARD ELLIOTT, who were using or being exposed to their asbestos-containing products and to the inhalation of the asbestos dust, fibers, or particles resulting from the intended, ordinary, or foreseeable use of their asbestos-containing products;

(b).     Caused to be released, published, or disseminated data and reports containing the dangers of their asbestos-containing products, which data and reports they knew, should have known, had reason to know, or could have reasonably been determined to be incorrect, incomplete, outdated, and misleading;

(c).     Deliberately chose to provide patently inadequate and ambiguous warnings and intentionally failed to warn of the known dangers when finally compelled by the state of medical art to provide notice of the dangers of their asbestos-containing products and the inhalation of asbestos dust and fibers resulting from the intended, ordinary, or foreseeable use of their asbestos-containing products;

(d).     Distorted, or caused to be misdiagnosed, the results of medical examinations conducted upon persons and workers like Plaintiff JAMES EDWARD ELLIOTT, who were using and handling said asbestos-containing products and being exposed to the inhalation of asbestos dust, fibers, or particles resulting from the intended, ordinary, or foreseeable

15

<u>EXHIBIT A</u>

use of their asbestos-containing products; and

(e). Refused and failed to test their asbestos-containing products, or tested their asbestos-containing products and willfully concealed or refused to publish adverse test results, or distorted said adverse test results so that the public persons such as Plaintiff JAMES EDWARD ELLIOTT were misled into believing the test results were not adverse.

30. Defendants, individually, jointly, and in conspiracy with each other, participated in the fraudulent scheme described in Paragraphs Twenty-Eight and Twenty-Nine (28 & 29) above, to keep Plaintiff JAMES EDWARD ELLIOTT in ignorance of his rights by fraudulently concealing the nature and extent of the harm which he has suffered as a result of using and being exposed to the defendants' asbestos-containing products and by fraudulently concealing that this harm was the direct and proximate result of the occupational use and exposure to the defendants' asbestos-containing products and the inhalation of asbestos dust and fibers resulting from the intended, ordinary, or foreseeable use of said asbestos-containing products, and, in fact, said fraudulent scheme did keep Plaintiff JAMES EDWARD ELLIOTT in ignorance of his rights.

31. Defendants, individually, jointly, and in conspiracy with each other intended, by the fraudulent misrepresentations and omissions as set forth in Paragraphs Twenty-Eight and Twenty-Nine (28 & 29) above, to induce Plaintiff JAMES EDWARD ELLIOTT to rely upon said fraudulent misrepresentations and omissions and to continue to expose himself to the dangers that the defendants knew to be inherent in the use of and exposure to their asbestos-containing products and the inhalation of the asbestos dust, fibers, or particles resulting from the intended, ordinary, or foreseeable use of said asbestos-containing products without warning to Plaintiff JAMES EDWARD ELLIOTT of these dangers, thereby depriving him of the opportunity of informed free choice as to whether to continue to use such asbestos-containing products and to expose himself

16

EXHIBIT A

to these dangers.

32.     Defendants, individually, jointly, in conspiracy with each other, and through trade associations in which they were members, maliciously, willfully, callously, and deliberately:

(a).     Exposed and continued to expose Plaintiff JAMES EDWARD ELLIOTT to the risks and dangers of asbestosis, mesothelioma, scarred lungs, cancer, and other illnesses and damage to various organs of the body, including injury to tissue and bone, all of which risks the defendants knew, should have known, had reason to know, or could have reasonably determined;

(b).     Failed to test and continue to test their asbestos-containing products regarding the risks and dangers to persons, who use or were exposed to their asbestos-containing products and the inhalation of the asbestos dust, fibers, or particles resulting from the intended, ordinary, or foreseeable use of said asbestos-containing products;

(c).     Ignored medical and scientific data regarding the risks of asbestosis, scarred lungs, cancer, mesothelioma, and other illnesses to workers like Plaintiff JAMES EDWARD ELLIOTT, who used or were exposed to their asbestos-containing products and the inhalation of the asbestos dust, fibers, or particles resulting from the intended, ordinary, and foreseeable use of said asbestos-containing products;

(d).     Sought methods to ignore or defeat Workmen's Compensation and other claims of workers like Plaintiff who suffered from illnesses or diseases from use of or exposure to their asbestos-containing products and the inhalation of the asbestos dust and fibers resulting from the intended, ordinary, or foreseeable use of said asbestos-containing products;

(e).     Attempted to discredit scientists, doctors, writers, and medical literature who or which indicated, demonstrated, or established a relationship between illness and disease from the use of and exposure to their asbestos-containing products and the inhalation of the

17

EXHIBIT A

asbestos dust and fibers resulting from the intended, ordinary, or foreseeable use of said asbestos-containing products;

(f).     Refused to conduct research on the relationship between asbestos exposure and disease because pecuniary motives of profit were followed at the expense of human lives;

(g).     Sought to create favorable publicity about asbestos-containing products for pecuniary motives when they knew of their risks and dangers;

(h).     Failed to seek safe substitute products for asbestos for pecuniary motives of profit at the expense of human lives;

(i).     Misled the public and workers such as Plaintiff, who used or were exposed to their asbestos-containing products and indicated that their asbestos-containing products were safe in their intended, ordinary, or foreseeable uses;

(j).     Concealed the existence of tests, data, literature, and medical reports regarding the causal relationship of asbestos to cancer, mesothelioma, scarred lungs, asbestosis, respiratory disorders, and other illnesses;

(k).     Refused to authorize testing and research involving the relationship of illness and disease to exposure to, use of, and inhalation of the asbestos dust, fibers, or particles resulting from the intended, ordinary, or foreseeable use of their asbestos-containing products fearing adverse publicity would affect the highly profitable market of asbestos sales;

(l).     Chose to rely on inaccurate or insufficient medical and scientific research or data regarding the causal relationship between asbestos-containing products and disease in order to avoid any possible adverse publicity that would affect sales of their asbestos-containing products; and

(m).     Failed to place adequate or proper warnings on their asbestos-containing

18

EXHIBIT A

products fearing that such warnings would adversely affect sales.

33.    Defendants as specifically identified below, individually and as agents of one another and as co-conspirators, agreed and conspired among themselves and with other asbestos manufacturers and distributors to injure JAMES EDWARD ELLIOTT in the following fashion:

(a).    Beginning in approximately 1934, conspirator Johns-Manville Corporation, through its agents, Vandiver Brown and attorney J.C. Hobart, and conspirator Raybestos-Manhattan, through its agents, Sumner Simpson and J. Rohrbach, suggested to Dr. Anthony Lanza, Associate Director, Metropolitan Life Insurance Company (insurers of Manville and Raybestos), that Lanza publish a study on asbestosis in which Lanza would affirmatively misrepresent a material fact about asbestos exposure:  that is, the seriousness of the disease process, asbestosis. This was accomplished through intentional deletion of Lanza's description of asbestosis as "fatal" and through other selective editing that affirmatively misrepresented asbestosis as a disease process less serious than it actually is and was known to be then.  As a result, Lanza's study was published in the medical literature in this misleading fashion in 1935.  The conspirators were motivated, in part, to effectuate this fraudulent misrepresentation and fraudulent nondisclosure by the desire to influence proposed legislation to regulate asbestos exposure and to provide a defense in lawsuits involving Manville, Raybestos, and Metropolitan Life, as insurer;

(b).    In 1936, conspirators American Brake Block Corporation, Asbestos Manufacturing Company, Gatke Corporation, Johns-Manville Corporation, Keasby & Mattison Company (then an alter ego to conspirator Turner & Newall), Raybestos-Manhattan, Russell Manufacturing (whose liabilities have been assumed by H.K. Porter Company), Union Asbestos and Rubber Company and United States Gypsum Company, entered into an agreement with the Saranac Laboratories.  Under this agreement, these conspirators acquired the power to decide what

19

EXHIBIT A

information Saranac Laboratories could publish about asbestos disease and could also control in what form such publications were to occur. This agreement gave these conspirators power to affirmatively misrepresent the results of the work at Saranac, and also gave these conspirators power to suppress material facts included in any study. On numerous occasions thereafter, the conspirators exercised their power to prevent Saranac scientists from disclosing material scientific data, resulting in numerous misstatements of fact being made at scientific meetings;

(c).  On November 11, 1948, representatives of the following conspirators met at the headquarters of Johns-Manville Corporation: American Brake Block Division of American Brake and Shoe Foundry, Gatke Corporation, Keasby & Mattison Company (then an alter ego to conspirator Turner & Newall), Raybestos-Manhattan, Inc., Thermoid Company (whose assets and liabilities were later purchased by H.K. Porter Company), Union Asbestos and Rubber Company and United States Gypsum Company. U.S. Gypsum did not send a representative to the meeting, but instead authorized Vandiver Brown of Johns-Manville to represent its interest at the meeting and to take action on its behalf;

(d).  At this November 11, 1948 meeting, these Defendants and their representatives decided to exert their influence to materially alter and misrepresent material facts about the substance of research started by Dr. Leroy Gardner at the Saranac Laboratories beginning in 1936. Dr. Gardner's research involved the carcinogenicity of asbestos in mice and also included an evaluation of the health effects of asbestos on humans with a critical review of the then-existing standards of dust exposure for asbestos and asbestos-containing products;

(e).  At this meeting, these Defendants intentionally and affirmatively determined that Dr. Gardner's work should be edited to specifically delete material facts about the cancer-causing propensity of asbestos and the health effects of asbestos on humans and the critique

20

EXHIBIT A

of the dust standards and then published same in the medical literature as edited by Dr. Vorwald. These Defendants thereby fraudulently misrepresented the risks of asbestos exposure to the public, in general, and the class of persons exposed to asbestos, including the Plaintiff;

(f).    As a direct result of influence exerted by the above-described conspirators, Dr. Vorwald published Dr. Gardner's edited work in the <u>Journal of Industrial Hygiene,</u> <u>AMA Archives of Industrial Hygiene and Occupational Health</u> in 1951 in a form that stressed those portions of Dr. Gardner's work that the conspirators wished stressed, but which omitted references to human asbestosis and cancer, thereby fraudulently and affirmatively misrepresenting the extent of the risks.  The conspirators affirmatively and deliberately disseminated this misleading Vorwald publication to university libraries, government officials, agencies and others;

(g).    Such action constituted a material affirmative misrepresentation of the total context of material facts involved in Dr. Gardner's work and resulted in creating an appearance that inhalation of asbestos was less of a health problem than Dr. Gardner's unedited work indicated;

(h).    The following conspirators were members of the trade association known as Quebec Asbestos Mining Association (Q.A.M.A.):   Johns-Manville Corporation, Carey-Canada, individually and as successor to Quebec Asbestos Corporation, the Celotex Corporation, successor to Quebec Asbestos Corporation, the National Gypsum Company, and Turner & Newall, individually and successor to Bell Asbestos.   These conspirators, members of Q.A.M.A., participated in the above-described misrepresentation of the work of Dr. Leroy Gardner published by Arthur Vorwald in the <u>AMA Archives of Industrial Health</u> in 1951.  Evidence of the Q.A.M.A.'s involvement in this misrepresentation arises from co-conspirator Johns-Manville's membership in the Q.A.M.A., as well as correspondence from co-conspirators dated 10/29/47, 11/26/47, 3/6/48, 10/15/48, 3/8/49, 9/6/50, and 3/21/51, and all indicating close monitoring of the editing process of

21

<u>EXHIBIT A</u>

Q.A.M.A.'s representative, Ivan Sabourin, acting on behalf of all Q.A.M.A. members;

(i).     Defendants who were members of the Q.A.M.A. as described above, began in or about 1950 to formulate a plan to influence public opinion about the relationship between asbestos and cancer by influencing the medical literature on this subject and then touting and disseminating this literature to the public and to organizations and legislative bodies responsible for regulatory control of asbestos with the specific intent of misrepresenting the existing scientific information and suppressing contrary scientific data in their possession and control;

(j).     This plan of misrepresentation and influence over the medical literature began on or about 1950 when the aforementioned Q.A.M.A. members selected Saranac Laboratories to do an evaluation of whether cancer was related to asbestos.  After a preliminary report authored by Arthur Vorwald in 1952 indicated that a cancer/asbestos relationship might exist in experimental animals, these Q.A.M.A. members refused to further fund the study and it was terminated and never publicly discussed;

(k).     As a result of the termination of this study, these Defendants fraudulently withheld information from the public and affirmatively misrepresented to the public and responsible legislative and regulatory bodies that asbestos did not cause cancer, including affirmative misrepresentations by conspirators' agents K.W. Smith, M.D., Paul Cartier, M.D., A.J. Vorwald, M.D., A.J. Lanza, M.D., Vandiver Brown and Ivan Sabourin, said misrepresentations being directed to inter alia, U.S. government officials, Canadian government officials, U.S. National Cancer Institute, other medical organizations and the general public, including the Plaintiff;

(l).     Subsequently, the Q.A.M.A. Defendant conspirators contracted with the Industrial Hygiene Foundation and Dr. Daniel Braun to further study the relationship between

EXHIBIT A

asbestos exposure, asbestosis and lung cancer.  In 1957, Drs. Braun and Truan reported to the Q.A.M.A. that asbestosis did increase a worker's chances of incurring lung cancer;

(m).    The Q.A.M.A. Defendant conspirators/members thereafter caused, in 1958, a publication of the work by Braun and Truan in which the findings regarding increased incidence of cancer in persons with asbestosis was edited out by agents of the Q.A.M.A.  The published version of this study contained a conclusion that asbestos exposure, alone, did not increase the incidence of lung cancer, a conclusion known by the Defendant conspirators to be patently false;

(n).    By falsifying and causing publication of studies concluding that asbestos exposure did not cause lung cancer and simultaneously omitting a documented finding that asbestosis did increase the risk of lung cancer, these Q.A.M.A. Defendant conspirators affirmatively misrepresented to the public and concealed from the public the extent of risks associated with inhalation of asbestos fibers;

(o).    In approximately 1958, these Q.A.M.A. Defendant conspirators publicized the edited works of Drs. Braun and Truan at a symposium in an effort to fraudulently misrepresent to the public and persons exposed to asbestos that the inhalation of asbestos dust would not cause cancer;

(p).    The fraudulent misrepresentations beginning in 1946 as elaborated above and continuing with the publication of the 1958 Braun/Truan Study influenced the standards set for threshold limit values for development of such standards to fail to lower the threshold limit value because of a cancer risk associated with asbestos inhalation;

(q).    In 1967, Q.A.M.A. Conspirators determined at their trade association meeting that they would intentionally mislead consumers about the extent of risks involved in inhalation of asbestos-containing products;

23

EXHIBIT A

(r).    In 1952, a symposium regarding the health effects of asbestos was held at the Saranac Laboratories.  The following conspirators were in attendance:  Johns-Manville, Turner & Newall, Raybestos-Manhattan, and Q.A.M.A. members by way of their agents, Cartier, Sabourin and LaChance;

(s).    At this meeting, the occurrence of lung cancer and asbestosis in product users was discussed and the carcinogenic property of all fiber types of asbestos was also discussed. In an affirmative attempt to mislead the public about the extent of health risks associated with asbestos, and in an effort to fraudulently conceal those risks from the public, these Defendants conspired to prevent publication of the record of this 1952 Saranac Symposium and it was not published.  In addition, the conspirators induced Vorwald not to announce the results of his and Gardner's animal studies showing excess cancers in animals which thereby fraudulently misrepresented existing secret data which could not be publicized owing to the secrecy provisions contained in the 1936 Saranac agreement heretofore described;

(t).    The following conspirators were members of the Magnesia Insulation Manufacturers Association:   Philip-Carey Corporation (predecessor to Celotex) and Johns-Manville;

(u).    In 1955, these conspirators caused to be published the MIMA 85% Magnesia Insulation Manual.  This manual falsely and fraudulently misrepresented that asbestos-containing products offered no hazard to workers who used these products;

(v).    The following conspirators were members of the trade organization known as the Asbestos Textile Institute (ATI):  Raybestos-Manhattan, Johns-Manville, H.K. Porter, Keasby & Mattison, individually and through its alter ego Turner & Newall, and National Gypsum;

24

EXHIBIT A

(w).   In 1947, these conspirators, members of the ATI, received a report from W.C.L. Hemeon regarding asbestosis which suggested re-evaluation of the then-existing threshold limit values for asbestos exposure.  These Defendants caused this report not to be published and thereby fraudulently concealed material facts about asbestos exposure from the public and affirmatively misrepresented to the public and class of persons exposed to asbestos that the existing threshold limit value was acceptable.  Thereafter, these Defendant conspirators withheld additional material information on the dust standards from the American Conference of Governmental Industrial Hygienists (ACGIH), thereby further influencing evaluations of threshold limit values for asbestos exposure;

(x).   In 1953, conspirator National Gypsum, through its agents, in response to an inquiry from the Indiana Division of Industrial Hygiene regarding health hazards of asbestos spray products, refused to mail a proposed response to that division indicating that respirators should be worn by applicators of the products.  National Gypsum's response distorted and fraudulently misrepresented the need for applicators of asbestos spray products to wear respirators and fraudulently concealed from such applicators the need for respirators;

(y).   In 1955, conspirator Johns-Manville, through its agent Kenneth Smith, caused to be published in AMA Archives of Industrial Health, an article entitled "Pulmonary Disability in Asbestos Workers".  This published study materially altered the results of an earlier study in 1949 concerning the same set of workers.  This alteration of Dr. Smith's study constituted a fraudulent and material misrepresentation about the extent of the risk associated with asbestos inhalation;

(z).   In 1955, the National Cancer Institute held a meeting at which conspirator Johns-Manville, individually and as an agent for other alleged co-conspirators and A. Vorwald, as

25

EXHIBIT A

agent of co-conspirators, affirmatively misrepresented that there were no existing animal studies concerning the relationship between asbestos exposure and cancer, when, in fact, the conspirators were in secret possession of several studies which demonstrated that positive evidence did exist;

(aa).   In 1957, these conspirators, members of the ATI, jointly rejected a proposed research study on cancer and asbestos and this resulted in fraudulently concealing from the public material facts regarding asbestos exposure and also constituted an affirmative misrepresentation of then-existing knowledge about asbestos exposure and lung cancer;

(bb).   In 1964, conspirators who were members of the ATI met to formulate a plan for rebutting the association between lung cancer and asbestos exposure that had been recently discussed by Dr. Irving J. Selikoff.  Thereafter, these members of the ATI embarked upon a campaign to further misrepresent the association between asbestos exposure and lung cancer;

(cc).   In 1970, through their agents, conspirators The Celotex Corporation and Carey-Canada affirmatively misrepresented that they had been in the asbestos business since 1918 and found no reported conditions of asbestosis or lung disease.  This constituted a fraudulent misrepresentation about the material facts known to these Defendants; and

(dd).   All conspirators identified above approved and ratified and furthered the previous conspiratorial acts of conspirators Johns-Manville, Raybestos Manhattan and A.J. Lanza, acting on behalf of Metropolitan Life Insurance Company, and all alleged co-conspirators during the dates and circumstances alleged above acted as agents and co-conspirators for the other conspirators.

34.   All conspirators identified above are liable for civil aiding and abetting in that they failed to warn the Plaintiff JAMES EDWARD ELLIOTT of the dangers of exposure to asbestos while acting in concert with one another or pursuant to a common plan to actively conceal such

26

EXHIBIT A

dangers and the conspirators knew that their conduct would result in the Plaintiff JAMES EDWARD ELLIOTT breathing asbestos dust, fibers, or particles without the knowledge that such exposure could foreseeably result in harm.

35.    The Plaintiff reasonably and in good faith relied upon the fraudulent misrepresentations, omissions, and concealments made by the Defendants individually, jointly, and in conspiracy with each other, regarding the safe nature of their asbestos-containing products, which reliance resulted in illness, injuries, and ultimately may cause death to JAMES EDWARD ELLIOTT.  Specifically:

(a).    The material published or caused to be published by the Defendants was false and incomplete in that the Defendants knowingly and deliberately deleted references to the known health hazards of asbestos and asbestos-containing products;

(b).    The Defendants individually, as members of a conspiracy, and as agents of other co-conspirators, intended that the publication of false and misleading reports or the nondisclosure of documented reports of the health hazards of asbestos;

(1).    maintain a favorable atmosphere for the continued sale and distribution of asbestos and asbestos-containing products;

(2).    assist in the continued pecuniary gain of the Defendants through the sale of their products;

(3).    influence in the Defendants' favor proposed legislation to regulate asbestos exposure; and

(4).    provide a defense in law suits brought for injury resulting from asbestos disease.

(c).    The Plaintiff JAMES EDWARD ELLIOTT reasonably relied upon the

27

<u>EXHIBIT A</u>

published medical and scientific data documenting the purported safety of asbestos and asbestos-containing products, and the absence of published medical and scientific reports on the hazards of asbestos and asbestos-containing products, to continue his exposure to asbestos because he believed it to be safe;

(d).    The Defendants individually, as members of a conspiracy, and as agents of other co-conspirators intended that the Plaintiff JAMES EDWARD ELLIOTT rely upon the published reports regarding the safety of asbestos and asbestos-containing products and upon the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-containing products, to continue his exposure to those products;

(e).    The Defendants individually, as members of a conspiracy, and as agents of other co-conspirators were and are in a position of superior knowledge regarding the health hazards of asbestos and therefore the Plaintiff JAMES EDWARD ELLIOTT had a right to rely on the published reports commissioned by the Defendants regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-containing products; and

(f).    As a direct and proximate result of the acts alleged herein the Plaintiff JAMES EDWARD ELLIOTT suffers damages as described in Court IV.

36.    The Defendants' foregoing acts, failures, or omissions were willful or wanton in nature; were undertaken with actual or constructive knowledge that injury would result; or were accomplished with such recklessness as to evince a conscious disregard for the health, safety, and rights of JAMES EDWARD ELLIOTT.

### COUNT IV - CONCLUSION

37.    The Plaintiff hereby incorporates by reference Paragraphs One (1) through Thirty-

EXHIBIT A

Six (36), inclusive, as if the same were hereto set forth at length.

38.     As a direct and proximate result of the negligence, carelessness, gross negligence, willful misconduct, breach of warranty, fraudulent concealment, misrepresentations and willful omissions of the defendants, JAMES EDWARD ELLIOTT contracted malignant mesothelioma which has caused JAMES EDWARD ELLIOTT pain, suffering, mental anguish, and ultimately will likely cause his death.  In addition, JAMES EDWARD ELLIOTT:

(a).    Has been obliged to spend various sums of money to treat his diseases and injuries, and may be obliged to continue to do so in the future;

(b).    Has sustained a loss of earnings and earning capacity;

(c).    Has had his enjoyment of life impaired;

(d).    Has had his life expectancy shortened; and

(e).    Has been caused to suffer great psychic trauma including cancer phobia.

39.     Any delay in filing Plaintiff's causes of action is a direct and proximate result of Defendants' failure to warn the fraudulent concealment hereinafter described.

(a).    For a long time the defendants have known of the hazards of asbestos inhalation and ingestion and had the duty to warn foreseeable users like JAMES EDWARD ELLIOTT, or others similarly employed, of the hazards of their asbestos products.  However, the defendants intentionally and fraudulently concealed said knowledge from Plaintiff or others similarly employed resulting in the failure of Plaintiff to discover the facts which are the basis of his causes of action despite the exercise of due diligence on behalf of the plaintiff.  Accordingly, any attempt on the part of any Defendant to complain about the timeliness of the commencement of Plaintiff's causes of action should be estopped.

WHEREFORE, Plaintiff prays for judgment against the Defendants, individually and

EXHIBIT A

jointly and severally, for compensatory damages in the sum of TWENTY MILLION DOLLARS

($20,000,000.00) and punitive damages in the sum of THREE HUNDRED FIFTY THOUSAND

DOLLARS ($350,000.00), together with interest from the date of diagnosis of asbestos-induced

disease plus costs of this suit and such other and further relief as is just and proper.

Respectfully submitted,

By_____
Of Counsel

Robert R. Hatten, Esquire (VSB No. 12854)
Hugh B. McCormick, III, Esquire (VSB No. 37513)
Daniel R. O. Long, Esquire (VSB No. 95873)
PATTEN, WORNOM, HATTEN & DIAMONSTEIN, L.C.
12350 Jefferson Avenue, Suite 300
Newport News, VA 23602
Telephone (757) 223-4500
Facsimile (757) 249-3242
rrhatten@pwhd.com
pleadings@pwhd.com

Nathan D. Finch, Esquire (VSB No. 34290)
MOTLEY RICE LLP
401 9th Street, NW, Suite 630
Washington DC, 20004
Telephone: (202) 232-5504
Facsimile: (202) 232-5513
nfinch@motleyrice.com

PLAINTIFF DEMANDS A JURY WITH RESPECT TO ALL ISSUES
TO WHICH HE IS ENTITLED BY LAW TO A JURY.

30

EXHIBIT A